Okay. Good morning, everyone. We'll begin with our first argument today in case number 21-18-17, LeCoultre versus Governor Evers and others. And Ms. Hogan, I can see you there. Can you hear us okay from the courtroom? Yes, I can, Your Honor. Okay, you may proceed. Good morning. May it please the court. My name is Vanya Hogan, and I represent the LeCoultre Ray, Lac du Flambeau, Bad River, and Red Cliff Bands of Lake Superior Chippewa. The district court held, and the state didn't appeal, that the tribes have a treaty right to permanent The court also held, however, that any time land within one of the four reservations passed to a non-Indian, it became taxable forever after, even when reacquired by a tribe or a tribal member. Ms. Hogan, can I ask you a question on that one particular issue? And maybe your argument is going to be that this is waived. But the way I read the Cass County case, in that case, the Supreme Court talks about alienability. It doesn't talk about the actual sale of the property. And I wonder if the district court here erred in following Cass County and saying that when the property is sold and then reacquired, it becomes taxable. Why under Cass County is it not taxable the moment that it becomes alienable, which would mean that the district court's order was too narrow and not overly broad, as you suggest? Well, I think that the reason the Cass County decision does not apply here, does not govern this situation, is because Cass County, the Supreme Court there found that the taxation on the Leech Lake reservation was allowed by operation of a federal statute called the Nelson Act. And the Leech Lake ban had argued in that case that while the Nelson Act authorized alienability of the land, it didn't authorize taxability of the land. And the Supreme Court disagreed with the tribe there and said that if Congress authorizes alienation of the land, then Congress is authorizing taxability of the land. Here, however, there is no congressional statute that authorizes taxability of the land. That's one of the reasons that the district court's decision was wrong. In fact, the district court's decision flouts both treaty interpretation law and common law Indian taxation cases. And so the court should reverse based on one or both of those reasons and find that when land within one of these four reservations is held by a tribe or a member of the tribe whose reservation it is, that the state is without authority to tax those lands. So first, the district court's holding was wrong as a matter of treaty interpretation law. The district court did correctly find that under the 1854 Treaty of La Pointe, the tribes negotiated for and received a right to permanent homelands that included the right to be free from state property taxes. That wasn't explicitly in the, there was no language in the treaty saying that the tribes were to be free from state property taxes, but the court found that taxation of Ojibwe land would be inconsistent with the permanency that was promised to them in the 1854 treaty. As I said, however, the court went on to find that the treaty right only exists so long as the land is held in Indian ownership, that is, it never passes into non-Indian hands. And in fact, the district court found that the act of selling property surrenders the tribe's permanent right. That's at page 22 of the district court's decision. There are at least three problems with that holding by the district court. First, the record shows that in many cases there actually was no act of selling the property. And I should remind the court that the tribes below filed rather extensive proposed findings of fact and supplemental findings of fact, and literally none of the defendants disputed a single one of those facts. So those are undisputed facts in the record. And what it shows is that while the district court is correct that sometimes the property on the reservation eventually was allotted, restrictions on alienation were lifted by the president, not by Congress, and the land was sold, in other cases that's not what happened. Sometimes the state was actually imposing the property taxes directly on the Indian allottees and tax deeds were issued and that's how they lost their property. It wasn't a voluntary sale. Sometimes parcels that were being taxed illegally were sold by the allottees to avoid having a tax deed issued. And in other instances, and this was quite common, the land transferred from an Indian allottee through inheritance to a non-Indian spouse. And then often it would transfer back through inheritance to the couple's tribal member children. So one reason the district court was wrong is that just factually there wasn't always a sale. But secondly, and I think even more importantly, is that the district court's reading of the treaty right was simply too narrow. Under the Supreme Court's Mille Lacs case, the court has to interpret the terms of the treaty as the Indians would have understood them and in the favor. And the record here shows that the tribes understood that they had a permanent homeland, which is inconsistent with being subject to tax and being able to lose the property through taxation. Ms. Hogan, can I ask you a question on the, it seems to me that if I've understood your position right, that it's the combination of the rights and protections conferred by the 1854 treaty and the absence of congressional allotment authority that provides the tax immunity. Is that a fair synthesis? It's those two things together. Well, I think together they certainly mean that the state cannot impose its taxes. But I think that actually either one independently, so either the tribe has a treaty right to permanent homelands that has not been abrogated, or, and it could be and, it could be or, since there is no federal statute that authorizes the state to impose the taxes, the state can't impose the taxes even apart from the, if the treaty right was not abrogated. Right. And you're also, you're also, as I read your briefs, you're quite quick to acknowledge that land sold to a non-Indian is taxable, right? Yes. Okay. And is that, is that because you recognize that upon alienation to a non-Indian, the treaty ceases to confer legal protection? No. So the tribes negotiated for the right to a permanent homeland, which they understood meant that they could never be required to leave from their reservations. That was their goal in negotiating the 1854 treaty. The record shows that the allotment provisions of the treaty weren't, there's not evidence that those were ever explained to the, to the Indians. So they weren't thinking about allotment, they were thinking about the communal ownership of their reservations that they would be able to hold forever. And then as it turned out, the allotment provisions did end up being used and lands were allowed to be alienated. But that doesn't mean that the tribe's right to a permanent homeland ever went away. So our position is... No, no, no. I understand that. But what, when, if you, if a municipality were to tax a part of the tribal land held by a non-Indian, how would you articulate the authority for the municipality to do that? What's the source of the authority as a legal matter? Well, the Supreme Court says that when it comes to state's ability to tax non-Indians in Indian country, there's a different set of rules. So we view it as... Right. What's the, what's the, what is the source or the foundation of that rule conferring that authorization? That's my question. That state's authority over non-Indians is greater than state authority is over tribes or tribal members. Right. And isn't that, isn't that because the property has been alienated to a non-Indian? Isn't that at its core what that legal recognition rests on? Yes, I think it is. Okay. And so if that, and this, this is the exact point the red brief makes. So if that, if that is true, then why, why is it that congressional allotment authorization is necessary? Or why, why are you taking the position that congressional allotment authorization is necessary? Because the, in the example I gave you, there's no, the allotment occurred by virtue of presidential authority, not congressional authority. Right. And we know that in that hypothetical, the municipality can tax Right. Because the Supreme court has said that if, if Congress authorizes alienation, then that means Congress is authorizing taxation. Right. But here we don't have that. As you, as you say, we don't have anything like that, but we do have, we do have a recognition by your clients that when the property is in the hands of non-Indians don't have a treaty right that they can exercise like the tribes and tribal members do. Okay. So it's the treaty, it's the treaty and the protections conferred by the treaty then that are, that are doing more work in your argument than the, than the absence of congressional allotment authorization. Well, I think it is the combination. So first there is a treaty right to be free from taxation and that right has not been aggregated by Congress. Only Congress can aggregate treaty rights. So that's one thing we don't have because the general allotment act doesn't apply here. And the state hasn't pointed us to any other statute that would allow allotment or taxation on the property. We don't have congressional authorization for the state to impose its tax on Indians in Indian country. And the Supreme court says that there's a categorical rule when it comes to taxation of Indians in Indian country. And so the test is you look to see, does the legal incidence of a tax fall? Does the legal incidence of an Indian tax fall? And does the legal incidence on an Indian or an Indian tribe in Indian country? And if the answer is yes, then there has to be congressional authorization to impose the tax. So Ms. Hogan, when, when Judge Scudder asked you about the principle or the authority that allowed a municipality to tax a non-Indian in Indian country, he then asked you, is it because there is a non-Indian? And you answered yes. Wouldn't the, isn't the more critical issue here the status of the land owner at that point? Not the fact that a sale or a conveyance took place, but that the person holding title at that moment is an Indian or non-Indian. And if it's an, if it's a Native American holding title, even if it's reacquired land, then all those principles you enunciated follow, there shall be no taxation. If it's a non-Indian, then there can be taxation under the very principles he was asking you to articulate. Yes. I think that I didn't mean to suggest otherwise from that, that it really depends on who holds title to the land under the Supreme Court's tax law. And if it's, as I was saying, if it's the legal incidence of the tax falls on an Indian in Indian country, then you have to have explicit congressional authorization for the state to impose the tax. And here, we simply don't have any authorization by Congress to impose the taxes here. So when you look at these tax cases, most of them don't involve property taxes. And I think the reason for that is that on so many reservations across the country, there is an allotment statute. There's the general allotment or something like the Nelson Act that applied on the Leech Lake reservation in the Cass County case. So there is explicit congressional authorizations where it says counts as authorization to tax. But here- Yeah. What you're saying there, I think, is that Cass County is a general allotment act case in your view. Well, it technically was the Nelson Act. Yeah. It's a different kind of case because there was a congressional statute at issue there. And here there isn't an act of Congress. Can you address a point made by the Second Circuit in Thompson? There, the lead opinion writer says that the only way for tribal land to be conveyed by treaty now is via the Indian Non- Intercourse Act. And so by the reasoning of that one opinion, all treaty lands somehow embody congressional action at this point. Would that apply here? Would that satisfy the congressional action requirement under Cass County? No. There was some argument about the Non-Intercourse Act below, but we are not basing our argument on the Non-Intercourse Act here. And why is the reasoning in your view of the opinion, that opinion in Thompson, not correct? Because the Non-Intercourse Act did not authorize taxation of the property or alienation of the property. And so it's distinguishable from this decision. And the better decision is the Sixth Circuit's decision in the Naftali case, which actually specifically addressed this particular treaty with respect to a reservation in Michigan that was created under the same treaty where the court found that there was no congressional authorization for the tax and that the treaty prohibited taxation. I'd like to reserve the remainder of my time if I could, and just urge the panel to reverse. Sure. Thank you. Mr. Bellavia, we'll move to you. Good morning. Morning. Thank you. Excuse me. May it please the court, I'm Wisconsin Assistant Attorney General Tom Bellavia, and I represent the State Defendant's Appellees, Wisconsin Governor Tony Ebers and Revenue Secretary Peter Barca. I'd like to just touch on some of the questions that were raised during the initial argument. One of the first questions that was asked was about the relationship between reservation land becoming alienable and being actually alienated, and whether the district court in this case should have held that the lands on these reservations became taxable when they became alienable. Here, I think the tribe's emphasis on the role of congressional action is significant with respect to the question of land becoming taxable because it is alienable. The U.S. Supreme Court has held for a long time that if Congress makes reservation land alienable, that alienability brings with it subjection to being taxable by the state, even if Congress has not explicitly said in the legislation that the land is taxable. But we also have this parallel path to taxability where the land has been actually alienated to a non-Indian. In that context, it's undisputed that land becomes taxable when it has actually been alienated, even in the absence of any congressional statute that rendered the land alienable. That is, in this case, the land was rendered alienable pursuant to the allotment provisions in the 1854 treaty, which allowed the president to allot, issue fee patents, remove any restrictions on alienability from those patents after which the land is alienable, but Congress was not involved. On the part of the district court decision that from which the state has not appealed, our district court held that for lands on these treaty reservations that have not actually been alienated, they did not become taxable simply because they were made alienable pursuant to presidential action. Congressional action would have been necessary. But the court ruled in the state's favor on the second issue, which was that when land has passed into non-Indian ownership and been actually alienated, the prior tax immunity is extinguished under the treaty. And it does not get revived if the tribe or a tribal member... Mr. Bellavia, where do you find the principle you just enunciated that if land is made alienable, it's then taxable even absent congressional action? Where do you find that when the Supreme Court cases we have, Gowdy, Yakima, Cass County, all consistently talk about being made alienable? Your Honor, it's a question that I have pondered and tried hard to research. It doesn't get singled out in the case law and expressly discussed in those terms in a way that provides us with a real bright line, a real bright line rule. There appears to be virtually, certainly among the parties here and the district court, there was universal acceptance of the idea that when land is actually alienated to non-Indians, it is then taxable by the state. The reason for that, the position the state has taken here is that the principled reason one can find in the case law for that, I think can be found by analogy to the discussions in the U.S. Supreme Court decisions like Montana and Brendale of the effect that the alienation of reservation land has on the jurisdictional status of that land. They weren't cases that dealt with this specific question, but the court did discuss what happens when land is alienated and what impact does that have on the legal status of the land. The crucial point there in that analysis is that when land is actually alienated to a non-Indian, it ceases to be set aside and protected under federal law in the way that it was before. The prior treaty-based right to exclude non-Indians from that land is relinquished by virtue of the act of alienation. Mr. Bellavia, you know what? In preparing for the articulation, it may well be correct, but let me tell you a difficulty that I have with it. How do you make sense out of the entire approach the Supreme Court took to City of Sherrill? You know what I mean by that? I think so. Because why is there a need in City of Sherrill for the court, page after page after page, to talk about whether equitable principles apply in a way to address the Oneida Nation's sale, allotments of property, and effective abandonment of that property within Oneida County in New York that way? If it was the alienation that was positive, I don't understand why the court reasoned at length through equitable principles. It just doesn't make any sense to me. I think that City of Sherrill is a very differently postured case than this, and the issue there is not a treaty-based immunity from taxation that has then possibly been extinguished by subsequent alienation of the land. I think the issue there, it involved treaties that predated, that were entered into by the state of New York, I believe, in the very early history of the country. I agree entirely with you there. Go back to the point you were making a second ago, that in your view, synthesizing all of this case law, the actual fact of alienation is important in your view. You know, that's what you just articulated. And I think, you know what, I see how you can read that into Cass County. I'm not sure that's the best reading of it, but I see how you could read it in there. But I'm not sure that you can make sense out of the way City of Sherrill, which is a state taxation case, right, where Montana and Brendale are in a different situation. That's the regulation, you know, tribes' authority to regulate non-Indian activity. I think that's kind of a different strand of the court's case law. The way the Supreme Court approached City of Sherrill doesn't make any sense on a broad principle of, in fact, alienation. To me, the basis of City of Sherrill is that the original alienation of the tribal lands was itself unlawful, but it was on an enormous scale and had been in effect for a very long time. And so the court went to equitable principles then to resolve the situation and say, we can't, the ship has sailed, it's too late to upset this big of an apple cart based on that the land was not lawfully alienated. The state's position here is that land that has been alienated pursuant to the allotment provision, the allotment and fee patenting provisions of the 1854 treaty have been lawfully alienated. And we have not claimed that unlawfully alienated lands are taxable by the state simply by virtue of their unlawful alienation. That would be closer to the City of Sherrill issue. The tribes have raised the issue that, and Ms. Hogan said during her argument, she referred to the fact that some lands on the reservations at issue in this case were unlawfully alienated in the past. That is established by the record. There are some land parcels that were unlawfully alienated, and there were other parcels that were lawfully alienated. The state's position has reference only to lawfully alienated parcels. We do not claim that if land was stolen from an Indian in the past by a non-Indian and then subsequently taxed by the state, that it's lawful for the Indian. It was never lawfully alienated. Whether there could ever be lawful taxation of unlawfully alienated land, I think is a question for a different case, depending on the circumstances, might involve equitable principles like those in City of Sherrill. But that's not at issue here. This case was never litigated as a case about the if the issue here were resolved in the state's favor, it would not preclude a tribal owner of a reservation parcel from arguing in the future that that parcel should not be taxed because it was never lawfully alienated to a non-Indian. Mr. Bellavia, do you concede that treaties are not congressional action? Yes. And so if we agree with the tribes here that treaties are not congressional action, which you also agree, Cass County does not apply, what then happens? Does the 1854 treaty control and you have a district court decision here that the treaty forbids taxation that you have not appealed? So what now? We did not appeal the portion of the district court decision that says that the treaty precludes state taxation of any land on these reservations that's owned by a tribe or a tribal member and that has not previously been alienated to non-Indians. So as to those parcels, we didn't appeal and that issue is decided. As to the parcels that have been alienated in the past, we agree with the district court's conclusion that those parcels do not regain, they are taxable when they are owned by non-Indians and under the reasoning of Cass County, they do not regain tax immunity if they later pass back to tribal ownership. I think that's really the key issue in this case is what I call the dormant tax immunity theory. The Cass County court rejected the theory that the tribe's treaty-based tax immunity goes to sleep if the land is alienated to a non-Indian and then reawakens if the land is subsequently taxable. Mr. Bellamy, I'd like to ask you a question about your answer. In Wrike v. Great Lakes Indian Fish and Wildlife Commission in 1993, we held that Indian treaties are deemed the legal equivalent of federal statutes. Do we have to overrule that case in finding that treaties are not congressional action? I would have to, I'm not familiar with that holding enough to venture an answer on what's very serious, a very serious question. I see the rationale. My instinctive reaction is that no, you don't have to overrule that holding. However, it might depend on the purpose for which one is construing a treaty provision as equivalent to a statute. I think there is... For purposes of a supremacy clause analysis, that would be correct? Right. Yeah. To your knowledge, has the... There are numerous courts that the tribe cite that have held that congressional action rather than simply presidential action is necessary. We argued below on the first issue on which we lost that we had congressional action here via the General Allotment Act, but the court rejected our argument on that issue. We did not argue that the treaty itself had the same effect as a congressional statute. And therefore, any time a treaty... If that rationale is correct, then any time a treaty renders land alienable, it would be the same as if Congress had rendered the land alienable. And under the cases dating back to Gowdy versus Meath, the land would become taxable at that point. But we hadn't... That hasn't been litigated in this case. Mr. Malabio, would you mind if I rewind you to the point you were making, which I think is an important one about Cass County and the dormancy aspect of that? Yes, thank you. Okay. So I think that the dormant... There was this dormant immunity theory that was rejected in Cass County. And I think the tribes essentially... The core legal issue that this court needs to decide is, are the tribes correct in suggesting that under the factual circumstances of this case, where we have only presidential action and not congressional action, that the dormant tax immunity theory should apply? Can I offer you a different reading of Cass County? You can tell me I'm wrong or mistaken about it. And that is that the whole issue of dormant revival of tax immunity came in a portion of the Supreme Court's analysis where it was responding to that exact position that was advanced by the tribe. Correct? I believe so. Yeah. Okay. But what preceded that seems to be of legal significance in the court's reasoning and also what follows it. Both what preceded it and what followed it was an emphasis by the court on the congressional authorization for alienability of the property. Okay. And so it's not... In other words, I guess to put the point differently, the way that I think you could read Cass County is to say, it's not at all about dormancy and revival or bringing back to life legal protection that has been gone. That legal protection was gone at the moment of the congressional allotment action. It's been gone a long time ago. From day one Congress acted, it doesn't turn upon the actual alienation of the property. So put differently, why not read Cass County as just right in keeping with what the court said about the importance of congressional authorization in County of Yakima? Well, I agree that Cass County clearly did not reach the question of the independent significance of actual alienation as opposed to alienability. It did not mean to reach that because it had congressional alienability in that case. The focuses on the congressional action because that was the case before the court. The state is suggesting that the reasoning that in that context, the Supreme court rejected the dormant immunity, the dormant immunity theory. And our position is that that same reasoning should apply and that the reasoning of Cass County regarding the dormancy theory should be extended to the where the only source of taxability is actual alienation rather than alienability conferred by Congress. And I think that's the question that this court has to decide. It's a question that the Supreme court has not squarely decided. It's a challenging question, but we think that the most the impact of alienation on the jurisdictional status of reservation lands. Now I want to address one point that the tribes made in their briefing that I think hasn't been discussed yet today as a counter argument is that under the state's position, essentially it empowers individual tribal members to waive the forever, the tribes collective communal treaty right to have their reservation immune from taxation by their individual decisions to alienate a parcel of land. And I think that argument is incorrect because it's really inconsistent with the is that initially the treaty confers on the tribe, the tribe holds the reservation communally, but then when the land is allotted, the tribes communal rights in the reservation land is converted into individual legal title. And if that individual legal title includes the right to alienate and the individual legal title holder alienates, then that action of alienation didn't do anything to the original communal rights of the tribe. Those communal rights had already been converted into, into, into individual legal title through the, through the allotment, through the allotment process. And so I think that's why, um, the, the rhetorical force of the argument that the individual members should not be allowed the way the tribes rights is diminished. My time has expired. So, um, I would just respectfully ask the court to affirm the very well. Thank you. Uh, Ms. Hogan, we'll return to you for rebuttal. Thank you, your honors. First, uh, what's absolutely clear here and what the state doesn't dispute is that the tribes do have a treaty, right? And contrary to what Mr. Bellavia was just saying, that right cannot be abrogated by the action of an individual selling a piece of property. As I said before, the record shows that the tribes negotiated to have a permanent homeland that they could stay on. So long as there was one Indian left, the allotment provisions of the treaty were not explained to them. The record shows that that really wasn't a focus of the negotiations at all. And so that tribes, the right that the tribes negotiated for, for a permanent homeland, uh, just simply cannot be abrogated by individuals later, uh, as a consequence of the permissive allotment provisions that were in the treaty, but not explained to the tribes. And would you, Ms. Hogan, I'm sorry to interrupt you. I'll let you finish your thought here in a second. Would you take that position? Even if by way of hypothetical, we start adjusting the facts and we start moving the facts in the direction of city of Sherrill. So for example, you have individual alienation decisions and you have massive amounts of time passing, say a hundred years, and then you have react. Is your legal position the exact same if we alter the facts? Well, I think that it probably would be. So how do you align it then with the, the reasoning in what is it city or County of Sherrill? Well, the city of Sherrill, um, is an unusual decision because the Supreme court based its decision on something that was not in the, uh, hadn't been argued at the court of appeals or below was just completely, and it hadn't even been briefed. Um, and so I guess while I think the tribes treaty right here, unless it is abrogated by Congress, because the Supreme court says that the only way a treaty right can be abrogated is if Congress takes a look at it, you know, intends to abrogate the treaty, right. And actually considers it and makes a decision to do that, um, that the treaty right exists, whether it was exercised 10 years ago or 200 years ago. But clearly here, the tribe has been continuously exercising these rights. Um, and their defenses that were based on the city of Sherrill, we moved for summary judgment on those and that was granted. So those, any kind of time-based defenses are completely irrelevant here. Thank you. Okay. Very well. Uh, thanks to both parties. Uh, the court appreciates the, um, qualities of the briefing and quality of the advocacy on these issues and the case will be taken under advisement.